# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

RUTH C. CHAREST and
JENNIFER N. KUFRIN,

      Plaintiffs,

v.                                CASE NO:  8:16-CV-2048-T-30JSS

SUNNY-AAKASH, LLC, agent of Holiday
Inn Express Hotel & Suites Spring Hill, and
JAYPRAKASH PANJABI, individually, also
know as Jay Panjabi,

      Defendants.

_____/

## ORDER

      THIS CAUSE comes before the Court upon Defendant Sunny-Aakash, LLC's

Dispositive Motion for Summary Judgment (Dkt. 37) and Plaintiffs' Response in Opposition

(Dkt. 44). The Court, having reviewed the motion, response, record evidence, and being

otherwise advised in the premises, concludes that the motion should be granted in part and

denied in part. Specifically, Defendant's motion is granted to the extent that it is entitled to

summary judgment on Plaintiffs' race and national origin claims. Defendant's motion is

denied with respect to Plaintiffs' sexual harassment and retaliation claims—these claims will

be resolved by the trier of fact.

## BACKGROUND

This is an action brought by Plaintiffs Ruth Charest and Jennifer Kufrin against their former employer, Sunny-Aakash, LLC, that owns and operates a Holiday Inn Express Hotel in Spring Hill, Florida (hereafter referred to as "Sunny-Aakash" or "Defendant"), and against Jayprakash Panjabi, Holiday Inn's general manager during the relevant time.[1] Panjabi is also an owner of Sunny-Aakash. Charest and Kufrin allege the following claims against Sunny-Aakash based on Panjabi's treatment of them during their employment: claims under 42 U.S.C. Section 1981 for discrimination and harassment because of race and national origin (Count I of the Second Amended Complaint); claims of sexual harassment under the Florida Civil Rights Act ("FCRA") (Count II of the Second Amended Complaint); and claims of retaliation under the FCRA (Count III of the Second Amended Complaint).

Sunny-Aakash moves for summary judgment on the entirety of Plaintiffs' claims. The facts, accepted in a light most favorable to Plaintiffs, the non-movants, now follow with respect to each Plaintiff.

**Plaintiff Ruth Charest:**

In April of 2013, Panjabi, an Indian male, hired Charest, a Filipino female, to work in Sunny-Aakash's housekeeping department. Charest worked for Sunny-Aakash from April 2013, until late May 2016. Charest was subjected to the supervision, authority, and control of Panjabi during her employment. Panjabi determined Charest's rate of pay, the number of

---

[1] Plaintiffs reached a settlement with individual Defendant Panjabi and filed a notice of dismissal of Panjabi with prejudice. *See* (Dkts. 41, 51, 52).

hours she worked, and her job assignments. He had complete firing authority. When Panjabi trained Charest on the hotel's policies, including policies on sexual harassment, he told her to contact him directly to report any issues. Panjabi frequently told Charest that he was her boss and that he owned the hotel.

The record reflects that throughout her three years of employment at Sunny-Aakash, Panjabi threatened Charest that if she did not give him oral sex and have sexual intercourse with him, she would lose everything—her job, her family, her husband—and she would be sent back to the Philippines. Panjabi frequently told Charest that she should be willing to have sex with him because she was Filipino. Charest was afraid of Panjabi, who is a very strong and intimidating man. Charest is a small woman, less than five feet tall.

According to Charest, Panjabi forced Charest to give him oral sex throughout her employment. She testified that he would frequently call her into a vacant hotel room, under the guise of requesting that she clean the room, and then he would pull down his pants, take out his penis, and tell her to give him oral sex. He would grab her by the head and push it down on his penis. Although Charest told Panjabi no and tried to reject him, she gave into his demands because she was scared of Panjabi and could not risk losing her job.

Panjabi would also corner Charest in the hotel's laundry room and force her to give him oral sex. Charest testified that she constantly told Panjabi that she did not want to give him oral sex but he would threaten to fire her if she did not give in to his sexual demands. Panjabi also demanded that Charest have sexual intercourse with him. According to Charest,

he would wait until they were alone in a hotel room, grab Charest's breasts, remove her clothes, and then force himself on her.

The record reflects that Charest had frequent coerced oral sex and sexual intercourse with Panjabi throughout her employment. After the sexual incidents, Panjabi would threaten Charest that if she reported his behavior she would be in "big trouble." Panjabi told Charest that he was powerful and could do anything he wanted, including terminating her and preventing her from finding another job. Panjabi also said that there was no one at the hotel who was above him; he was the "big boss."

Charest testified that on one occasion Panjabi forced her to have sexual intercourse with Panjabi and his friend "Kevin." The men forced Charest to give them oral sex and then took turns having sexual intercourse with her.

Panjabi also forced Charest and Plaintiff Jennifer Kufrin to kiss each other and then engage in group sex with him. Panjabi took turns having sex with the women.

The record reflects that Panjabi told Charest that because she was Filipino she should be willing to provide sex to Indian men who he said were superior.

In early May of 2016, Charest decided that she was finished giving into Panjabi's sexual demands. Charest testified that she felt more powerful knowing that Kufrin, who Panjabi was also sexually abusing, was a witness. Before that, she felt like she would not be believed because she was in housekeeping and Panjabi was powerful.

In late May of 2016, Panjabi demanded that Charest give him oral sex. Charest refused. Panjabi started yelling at her and Charest slapped him on his face. Panjabi then

terminated her. According to Charest, Panjabi terminated her because she refused to give him oral sex.

**Plaintiff Jennifer Kufrin:**

In July of 2015, Panjabi hired Kufrin to work at the hotel's breakfast bar. Kufrin worked for Sunny-Aakash from July 2015, until late May 2016. Kufrin was subject to the supervision, authority, and control of Panjabi. He determined her hours, rate of pay, and job duties.

During her employment, Panjabi constantly touched Kufrin and made comments about her body. Panjabi told Kufrin repeatedly that because she was "white trash" from Spring Hill she should provide him with sexual favors. Thereafter, Panjabi frequently told Kufrin to go to an empty hotel room and wait for him. When she arrived, Panjabi would pull down his pants, point to his penis, and tell her to "make it hard." If Kufrin refused, Panjabi grabbed her and pushed her down.

Panjabi threatened Kufrin that if she did not have sexual intercourse with him he would replace her. She testified that she believed that he would terminate her if she did not give in to his sexual demands. Kufrin began meeting Panjabi in vacant hotel rooms and other places at the hotel, like Panjabi's office, at his demands and allowed Panjabi to have sexual intercourse with her. He also frequently forced her to give him oral sex. When she refused, he got angry and threatened her with termination. When she gave in to Panjabi, he would reward her with extra hours and promotions.

On the occasions when Kufrin refused Panjabi's sexual demands, Panjabi would tell her that white women were lazy, stupid, and garbage. He frequently told Kufrin that he and his Indian investors would dominate the "white trash" who lived in Spring Hill. He said he could get her to do what he wanted because he had power and money. Panjabi told Kufrin repeatedly that she was "white trash" and that white women from Spring Hill were only good for providing sex to powerful men like Panjabi. Kufrin testified that the only time she was disciplined for poor performance was when she would not give in to Panjabi's sexual advances. She was afraid to tell anyone about Panjabi's behavior because she needed to keep her job and Panjabi told her she would never work again if she complained.

Kufrin testified that on one or two occasions Panjabi made her and Charest engage in group sex with him. He made them kiss and touch each other, give him oral sex, and then he took turns having sexual intercourse with them while the other one watched. Panjabi told them that if they did not give in to him they would be terminated.

According to Kufrin, she could not complain to anyone about Panjabi because he was the only manager and supervisor—"there was nobody to go to." She testified that Panjabi "always" said that he was the manager, the boss, and the owner, and that if Kufrin had any problems at work, she should go to him.

In approximately March of 2016, Panjabi started to demand that Kufrin have sex with him and his friends. He also started to demand anal sex. Kufrin refused these demands and told Panjabi that what he was doing was illegal. At some point in late May of 2016, Panjabi demanded oral sex from Kufrin and she refused. Panjabi then fired her. According to

Kufrin, Panjabi terminated her employment because she refused to comply with his sexual demands.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

### I.  Plaintiffs' Section 1981 Race and National Origin Claims

Section 1981 provides all persons the same right to "make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). For purposes of the statute, the term "make and enforce contracts" includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1981 prohibits material adverse actions in private employment based on the employee's race. *See CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 450-51 (2008). Notably, section 1981 prohibits race discrimination against whites as well as nonwhites. *See McDonald v. Santa Fe Trail Transp.,* 427 U.S. 273, 287 (1976). Section 1981 also prohibits an employer from retaliating against an employee for opposing or complaining about conduct that violates section 1981's

substantive prohibition against race discrimination.  *See CBOCS West,* 553 U.S. at 446; *Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F.3d 1249, 1257-58 (11th Cir. 2012); *Bryant v. Jones,* 575 F.3d 1281, 1301 (11th Cir. 2009).

Defendant argues that it is entitled to judgment on Plaintiffs' racial and national origin harassment claims because the comments Panjabi made about Plaintiffs' race were not sufficiently severe or pervasive to alter the terms and conditions of their employment and create an abusive working environment.  The Court agrees.  To establish a prima facie case of a hostile work environment, an employee must prove: that she belongs to a protected group; that she has been subject to unwelcome harassment; that the harassment was based on a protected ground, such as race or sex; and that the harassment was severe or pervasive enough to alter the terms and conditions of her employment.  *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

In order for harassment to be "severe or pervasive," the offensive behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives ... to be abusive.  *See id.* at 1276 (quotations omitted).  District courts should consider: the frequency of the conduct; its severity; whether the conduct was threatening or humiliating, or was instead an isolated offensive utterance; and whether the conduct unreasonably interfered with the employee's performance.  *See id.*

Here, the record reflects that Panjabi's comments about Plaintiffs' race were not severe and pervasive as a matter of law.  Charest testified that Panjabi told her on about three

occasions that, because she was Filipino, she should provide sex to Indian men. These three comments, made over a period of three years, fall woefully short of establishing severe and pervasive conduct. *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (instances of racially derogatory language over a period of two-and-a-half years were "too sporadic and isolated" to qualify as severe or pervasive).

Kufrin testified that Panjabi called her "white trash" and said to her "all the time" that white women are "stupid, garbage, and lazy." This is also insufficient to establish a harassment claim because, while these comments were frequent, the comments were not severe enough to create an abusive working environment or a hostile work environment. *See Mendoza v. Borden*, 195 F.3d 1238, 1253-54 (11th Cir. 1999) ("Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace"). Notably, neither Plaintiff testified that Panjabi's comments *about their race* impacted their work environment. Accordingly, neither Plaintiff has established a genuine issue for trial with respect to their racial harassment claims.

Finally, the record is devoid of a genuine issue of fact on any claim that Panjabi subjected Plaintiffs to adverse actions *based on their race*. Plaintiffs consistently testified that any adverse actions, including their terminations, were based on their refusal of Panjabi's sexual demands. Although this may establish a claim based on the protective characteristic of sex, it does not establish a race-based claim.

In sum, Defendant is entitled to summary judgment on Plaintiffs' claims of discrimination and harassment based on race and national origin (Count I of the Second Amended Complaint).

## II.     Plaintiffs' Sexual Harassment Claims

Defendant assumes, for the limited purpose if its motion for summary judgment, that Plaintiffs may be able to establish hostile work environment claims based on Panjabi's sexually harassing behavior.  Defendant argues that it is still entitled to judgment on these claims because the *Faragher/Ellerth* affirmative defense applies.  In *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court held that an employer is not vicariously liable for a hostile work environment created by a supervisor if "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher*, 524 U.S. at 807.

Defendant's argument that the *Faragher/Ellerth* defense applies in this case misses the mark for two reasons.  First, it is bedrock law that the defense does not apply when the supervisor's harassment results in a "tangible employment action" like termination.  In that scenario, the employer is strictly liable regardless of any preventive or corrective measures in place.  *See id*; *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 421-22 (11th Cir. 1999) ("[A]n employer is vicariously liable for sexual harassment committed by a supervisor when the harassment results in a 'tangible employment action' (such as

termination or unwanted reassignment) against the victimized employee.") (quoting *Ellerth*, 524 U.S. at 764-65; *Faragher*, 524 U.S. at 807-08) . Here, both Plaintiffs unequivocally testified that Panjabi's sexual harassment culminated in their terminations.

Second, even assuming for the sake of argument that Panjabi's harassment did not result in a "tangible employment action," the record is rife with facts that Panjabi was Defendant's "alter ego," another preclusion to asserting a *Faragher/Ellerth* defense. In other words, Panjabi held "such a high position in the company that he could be considered the employer's 'alter ego,'" which renders Defendant strictly liable for his behavior. *See Dees*, 168 F.3d at 421-22. In this scenario, Defendant would also not be entitled to the *Faragher/Ellerth* defense. *See id; see also Smith v. Akstein*, 408 F. Supp. 2d 1309, 1329-30 (N.D. Ga. 2005) ("[T]his Court is aware of no authority in this Circuit or elsewhere holding that an individual who is indisputably within such a position as to be a company's alter ego does not invoke strict liability on the company for his harassing behavior.").

It is worth emphasizing that the record reflects that Panjabi was an owner and general manager of Defendant. He hired Plaintiffs. He controlled their hours, rates of pay, any promotions or demotions, and he had ultimate firing authority. Panjabi frequently told Plaintiffs that he was their only boss and that if they had any complaints they were to complain to only him. Panjabi constantly told Plaintiffs that he was an owner of Defendant and could do what he wanted because he had the "power." To apply the *Faragher/Ellerth* defense under these circumstances would be contrary to binding law. Accordingly, Defendant's motion is denied with respect to Plaintiffs' sexual harassment claims.

## III.    Plaintiffs' Retaliation Claims

Plaintiffs' retaliation claims are premised on the timing of their refusal to engage in further sexual demands with Panjabi and their terminations.  According to Plaintiffs, when they told Panjabi that they were not going to give him oral sex and that what he was doing was wrong, Panjabi immediately terminated their employment.  Defendant argues that it is entitled to summary judgment because the rejection of sexual advances does not constitute "protective activity" under Title VII.  The Court disagrees that such a blanket rule applies.

 Title VII's anti-retaliation provision prohibits employers from retaliating against an employee who "oppose[s] any practice made an unlawful employment practice by this subchapter . . ."  42 U.S.C. § 2000e-3(a).  This clause is known as the "opposition clause." *Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009). While the opposition clause leaves the term "oppose" undefined, courts have generally viewed an employee as engaging in protected opposition when she voices concern about or resistance to violations of Title VII.  *See id.* at 276 ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity") (internal citations omitted).

Although not addressed by either party in their filings, the Court is mindful that a circuit split exists surrounding the issue of "whether a person who rejects a supervisor's sexual advances has engaged in protected activity."  *Tate v. Executive Mgmt. Servs., Inc.,* 546 F.3d 528, 532 (7th Cir. 2008)(comparing *LeMaire v. La. Dep't of Transp.*

*& Dev.,* 480 F.3d 383, 389 (5th Cir. 2007)[2] (holding that a single, express rejection of sexual advances does not constitute "protected activity" for purposes of a retaliation claim) with *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1007 (8th Cir. 2000) (concluding that when the plaintiff told her supervisor to stop harassing her, she engaged in the most "basic form of protected conduct")). The Eleventh Circuit has not weighed in on this issue. However, the facts of this case are similar to those presented in *Ogden*. In this case, the record reflects that Plaintiffs felt pressured to engage in sexual acts with Panjabi, they attempted to reject his sexual advances, they knew that what Panjabi was doing was wrong, and when they decided they were finished giving into his sexual demands and refused his demands for oral sex, they were immediately terminated. Unlike the facts presented in *LeMaire*, this was not a single, express rejection.

Notably, the Sixth Circuit recently addressed the circuit split and aptly reasoned:

[W]e conclude that a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII. Sexual harassment is without question an "unlawful employment practice." If an employee demands that his/her supervisor stop engaging in this unlawful practice—i.e., resists or confronts the supervisor's unlawful harassment—the opposition clause's broad language confers protection to this conduct.
. . .
We note that only one of our sister circuits has concluded that communication directed solely to a harassing supervisor does not constitute protected activity. In *Frank v. Harris County,* 118 Fed.Appx. 799, 804 (5th Cir. 2004), the Fifth Circuit held that the plaintiff "provide[d] no authority for the proposition that a single 'express rejection' to [a harassing supervisor] constitutes as a matter of law a protected activity." In reaching this conclusion, the Fifth Circuit

---

[2] *LeMaire* relied on the earlier unpublished case of *Frank v. Harris County,* 118 Fed.Appx. 799, 804 (5th Cir. 2004).

neither assessed the language of the opposition clause of Title VII nor indicated why a complaint to the harassing supervisor would not fall within the confines of the provision. *See generally id.* Therefore, we are not persuaded by *Frank.*

*E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067-68 (6th Cir. 2015).

The reasoning in *New Breed Logistics* is sound. It would be anomalous, and would undermine the fundamental purpose of the statute, if Title VII's protections from retaliation were not triggered when an employee confronts a supervisor harasser and demands that the harassment stop. "Such an outcome would render Title VII's prohibition on retaliation illusory for any employee who stands up to a harasser supervisor to bring a halt to a sexually hostile work environment." *Ross v. Baldwin Cty. Bd. of Educ.*, No. CIV.A. 06-0275-WS-B, 2008 WL 820573, at *5-*6 (S.D. Ala. Mar. 24, 2008) (concluding that "plaintiff's unequivocal demand that her supervisor cease groping her in the workplace unquestionably constituted protected conduct satisfying the first element of the prima facie test under Title VII."). Accordingly, Defendant's motion is denied with respect to Plaintiffs' retaliation claims. A reasonable jury could find that Plaintiffs' refusal to engage in further sexual acts with Panjabi constituted protected activity. Defendant's remaining arguments are without merit.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant Sunny-Aakash, LLC's Dispositive Motion for Summary Judgment (Dkt. 37) is GRANTED in part and DENIED in part as stated herein.

**DONE** and **ORDERED** in Tampa, Florida on September 20, 2017.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record